**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

_____
                                               :
KELLY GOODRIDGE                 :                    CIVIL ACTION NO.
                                               :
        **Plaintiff**                      :
                             :
V.                                             :
                                               :
EXACTECH, INC.                    :
EXACTECH US, INC.               :
                                               :
        **Defendants**                 :                    _____
_____

**ORIGINAL COMPLAINT AND**
**DEMAND FOR JURY TRIAL**

Plaintiff, Kelly Goodridge, brings this action for personal injuries suffered as a direct and proximate result of the misconduct of Defendant Exactech, Inc., and Defendant Exactech US, Inc., (collectively, "Defendants" or "Exactech") and demands a trial by jury. In support of his Complaint, Plaintiff alleges the following:

## NATURE OF THE CASE

1.      This personal injury action relates to Exactech's misconduct with respect to its design, testing, manufacturing, packaging, storage, labeling, distribution, marketing, and/or sale of Total Knee Arthroplasty Systems (TKA Systems), inclusive of Exactech TKA System components used in surgery performed on the Plaintiff.

2.      For many Americans, the solution to chronic or worsening knee joint pain is to replace the joint in its entirety. While most knee replacements last for several years, the Exactech TKA Systems, inclusive of the Exactech TKA System used in Plaintiff's surgery, fail sooner and more often than others on the market.

1

3.      Exactech admits many of these premature and frequent failures are due to the improper packaging of a component part, the polyethylene insert, which exposes the part to oxygen, causing it to oxidize, and ultimately to deteriorate at an accelerated rate. This eventually leads to premature failure of the entire knee system.

4.      As a result of Exactech's negligence, including its inadequate packaging of this component part, thousands of patients implanted with knee replacement systems have had to undergo (or likely will have to undergo) significant revision surgeries to remove and replace the defective devices.

5.      The Plaintiff was implanted with an Exactech TKA System which failed prematurely, resulting in the need for revision surgeries and significant complications requiring various medical evaluations, diagnostic studies, treatment, therapy, and additional surgeries which caused the Plaintiff to incur substantial medical bills and expenses.

6.      Accordingly, Plaintiff brings the instant suit, demands judgment against Exactech, and requests, among other things, compensatory damages, statutory damages, punitive damages, attorneys' fees, and costs.

## THE PARTIES

### PLAINTIFF

7.      Plaintiff, Kelly Goodridge, is a resident of Newtown, Connecticut in Fairfield County and, thus, a citizen of Connecticut.

8.      Plaintiff was implanted with an Exactech TKA System during surgery performed in Connecticut in May of 2018, which failed prematurely.

9.      As a result of the failure of the Exactech TKA System, Plaintiff had to

undergo revision surgeries sustaining significant complications requiring various medical evaluations, diagnostic studies, treatment, therapy, and additional surgeries which caused the Plaintiff to incur substantial medical bills and expenses.

**DEFENDANTS**

10.    Defendant Exactech, Inc., is a Florida corporation with its principal place of business located at 2320 NW 66th Court, Gainesville, Florida 32653.

11.    Upon information and belief, Defendant Exactech, Inc., designs, tests, develops, manufactures, labels, packages, markets, distributes, and/or sells orthopedic joint replacements, inclusive of the system used in Plaintiff's total knee replacement surgery, and related surgical instrumentation, throughout the United States, including in the State of Connecticut.

12.    Upon information and belief, at all relevant times, Defendant Exactech, Inc., was engaged in promoting, distributing, selling, or otherwise introducing its TKA Systems into interstate commerce throughout the United States including in the State of Connecticut, and generating substantial revenue as a result.

13.    Upon information and belief, Defendant Exactech, Inc., manufactured the knee replacement system implanted in Plaintiff.

14.    Upon information and belief, Defendant Exactech US, Inc., is a wholly owned subsidiary of Exactech, Inc., with its principal place of business located at 2320 NW 66th Court, Gainesville, Florida 32653.

15.    Upon information and belief, Defendant Exactech US, Inc., conducts Exactech's U.S. sales and distribution activities.

16.    Upon information and belief, Defendant Exactech US, Inc., is engaged in

the business of promoting, distributing, selling, or otherwise introducing its TKA Systems into interstate commerce throughout the United States, including in the State of Connecticut, and generating substantial revenue as a result.

17.    Upon information and belief, the knee replacement systems manufactured by Defendant Exactech, Inc., were distributed by Defendant Exactech US, Inc., throughout the United States, including in Connecticut, where Plaintiff received his total knee replacement system.

18.    Upon information and belief, Corporation Service Company at 1201 Hays Street, Tallahassee, Florida 32301 is a registered agent of or is authorized to accept service of process for both Exactech, Inc. and Exactech US, Inc.

## JURISDICTION & VENUE

19.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship.

20.    This Court has personal jurisdiction over Exactech because each through its respective employees, agents, or sales representatives have transacted business in the State of Connecticut and within the District of Connecticut; solicited residents of the State of Connecticut; and engaged in substantial business activities, including, but not limited to, activities giving rise to the events and misconduct described in Plaintiff's complaint. Accordingly, Defendants both have sufficient minimum contacts with the State of Connecticut such that it does not offend traditional notions of fair play and substantial justice to have them answer for its misconduct in this Court.

21.    Additionally, a significant portion of the actions and omissions described

4

in Plaintiff's complaint took place in the State of Connecticut.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because both Defendants transact and conduct business in Connecticut, a substantial part of the acts and omissions giving rise to this Complaint occurred in Connecticut, and because Plaintiff is a resident and citizen of Connecticut.

## FACTUAL BACKGROUND

### *Knee Replacements and Components*

23.     Total knee arthroplasty is a common orthopaedic surgery that involves replacing the articular surfaces of the joint with smooth metal and highly cross-linked polyethylene plastic.

24.     In a total knee arthroplasty, the femoral condyles and tibial plateau of the knee joint are replaced.

25.     Arthroplasty polyethylene inserts are the plastic liners placed between the two metallic surfaces in a fixed-bearing knee replacement. In essence, these polyethylene inserts serve as cushions-or shock absorbers-between the metal components in knee replacements.

### *Exactech® Knee Polyethylene Inserts*

26.     Exactech's TKA systems are classified as a knee joint patellofemorotibial polymer/metal/polymer semi-constrained cemented prosthesis. They feature a mix of polyethylene and metal-based components.

27.     Exactech's TKA systems are comprised of the following parts: a femoral cap, a tibial tray, and sometimes a patellar cap. The patellar cap and tibial tray are both made of polyethylene.

### Properties of Polyethylene and its Use in TKA Systems

28.     Polyethylene is a polymer of ethylene-a hydrocarbon-which consists of as many as 200,000 ethylene repeat units. Ethylene is polymerized in the presence of catalysts to make ultra-high molecular weight polyethylene ("UHMWPE"), which is commercially produced as resin powder. The resin powder is then consolidated into rods/sheets from which final inserts found in TKAs are made.

29.     Polyethylene is a significant element of TKAs, and its development has undergone considerable changes in the last thirty years. While polyethylene is commonly used in TKAs, there are several concerns with *in vivo* use. Specifically, polyethylene inserts cannot be exposed to oxygen during the packaging and storing process. Exposing polyethylene inserts to oxygen creates a chemical reaction called oxidization, which causes the premature wear or degradation of polyethylene inserts. As such, polyethylene inserts must be handled with a high degree of care when processed, packaged, and stored.

30.     The oxidation process is time-dependent and can also occur before the liner is even implanted in a patient if the liner is exposed to air. Thus, airtight packaging is crucial and requires multiple barriers that adequately prevent oxidation.

31.     Wear characteristics of polyethylene are directly influenced by techniques of processing, storing, and packaging methods. These processes are significantly aimed at preventing the oxidation of the polyethylene inserts. Proper packaging and storage prevent oxidation and reduce the risk of failure from strength changes in the polyethylene inserts. Preventing the oxidation of polyethylene through proper processing, storing, and packaging methods directly prevents the wear of the polyethylene inserts.

32.    Wear of polyethylene is a direct cause of component loosening and other component failures. Accordingly, the wear of polyethylene components is likely to cause severe complications, including swelling, grinding, instability, tissue damage, osteolysis, permanent bone loss and other injuries. This ultimately causes the entire systems to fail and patients to need revision surgeries.

### The Importance of Appropriate Packaging Is Well-Understood

33.    It is widely understood in the medical device industry that if polyethylene components are exposed to air, they will oxidize and degrade. Accordingly, when manufactured and stored, polyethylene components must and should be packaged in multiple-layered, sufficiently oxygen-resistant vacuum-sealed bags.

34.    Throughout the medical device industry, precautions are taken to ensure polyethylene components are properly packaged to avoid oxidation.

### Exactech's False & Misleading Performance Claims

35.    Upon information and belief, Exactech represented to doctors, patients, and the general public that its fleet of TKA systems were "excellent," high quality, and reliable. For example, its TKA marketing materials boasted:

> "with a design developing for more than four decades and excellent clinical and laboratory results, surgeons can have confidence in a knee system that continues to demonstrate performance over time. Surgeons around the world continue to document excellent long-term clinical results with the Optetrak family of products."

36.    Upon information and belief, Exactech's marketing materials similarly boasted low revision rates.

37.    Upon information and belief, Exactech's marketing materials did not disclose several investigations and ongoing claims that its TKA Systems and Total Ankle

Arthroplasty (TAA) Systems were, in fact, failing much sooner and at much higher rates than others on the market.

**Exactech's History of TKA and TAA Performance Issues**

38.    Upon information and belief, as early as 2012, Exactech was aware (or should have been aware) that its TKA systems were failing at a higher rate than promoted due to the oxygenation of the polyethylene components.

39.    For example, reports in the Manufacturer and User Facility Device Experience (MAUDE) database in 2012 indicate instances of revision due to "loose tibial component", "aseptic loosening", "pain and visible loosening", "polyethylene deformation", "polyethylene worn", and "pain, limited mobility, knee swelling and sensitivity" caused by loosening in the joint replacement.

40.    Additional examples from 2014 list "revision due to tibial loosening", "tibial loosening", "revision of [O]ptetrak knee components due to tibial loosening", "revision due to pain and loosening", and "revision of [O]ptetrak knee components due to aseptic loosening", as well as several reports of "revision of knee components due to tibial loosening", and "revision of [O]ptetrak knee components reportedly due [to] aseptic loosening".

41.    This experience was not unique to U.S. patients. Upon information and belief, according to the 2020 Australian National Joint Replacement Registry, the rate of revision for a TKA utilizing an Optetrak tibial component with a Optetrak- CR femoral component was 8.5% at ten (10) years and 10.2% at ten (10) years when implanted with a Optetrak-PS femoral component; both rates far exceed international guidelines for acceptable revision rates, upon information and belief.

42.    Likewise, upon information and belief, the Australian Orthopaedic Association has remarked that the Optetrak TKA Systems have a "higher-than-expected" rate of revision.

43.    Upon information and belief, per the recommendations established by the International Benchmarking Working Group and applied by the Australian Orthopaedic Association, the Optetrak TKA Systems do not qualify for a "superiority benchmark" or even a "non-inferiority benchmark" because of its high failure rate.

### *Exactech Was Aware Of The Problem, But Did Nothing*

44.    Upon information and belief, it is widely recognized and accepted in the medical device industry that reported adverse events represent only a small fraction of adverse events associated with and/or caused by a particular device.

45.    Despite Exactech's knowledge of early onset failures of its TKA systems, Exactech continued to design, warrant, manufacture, promote, sell, and distribute them without alerting surgeons or patients of its potential increased risks of early onset failures.

46.    Exactech never changed the labeling, marketing materials, or product inserts to adequately and accurately warn patients or doctors of the associated increased risks of early failure due to loosening or polyethylene wear.

47.    Exactech did, however, quietly, and without providing information or explanation for its decision to patients, doctors, or the general public, begin replacing the tibial trays of some Optetrak models.

***Exactech Recall***

48.     Finally, in August 2021, Exactech recalled a limited number of its TKA and TAA systems.

49.     Upon information and belief, Exactech notified distributors and sales representatives of the limited recall on approximately August 30, 2021, in a letter entitled 'URGENT MEDICAL DEVICE RECALL.' In part, the letter clarified that Exactech was "removing all Knee and Ankle UHMWPE products labeled with an 8-year shelf life and not packaged in EVOH/Nylon bags, in a phased approach over 12 months."[1]

50.     Upon information and belief, the actions and timing as to each phase was described as follows:

>   **Phase 1:** immediately return all knee and ankle UHMWPE devices labeled with an 8-year shelf life that will be 5 years old or older by 08/31/2022 not packaged in EVOH/Nylon bags.

>   **Phase 2:** between 05/31/2022 to 08/31/2022, returning all remaining knee and ankle UHMWPE devices labeled with an 8-year shelf life not packaged in EVOH/Nylon bags."[2]

51.     Notably, Exactech did not issue any communications to surgeons who had implanted Optetrak, Truliant, or Vantage Systems with a recalled polyethylene component or to patients who had received an Optetrak, Truliant, or Vantage Systems with a recalled polyethylene component until months later in February 2022.

52.     On February 7, 2022, Exactech issued an "Urgent Medical Device Correction" in which it informed health care professionals that:

>   After extensive testing, we have confirmed that most of our inserts manufactured since 2004 were packaged in out-of-specification (referred

---

[1] *See* U.S. FOOD & DRUG ADMIN., *Class 2 Device Recall OPTETRAK Comprehensive Knee System (Oct. 04, 2021)* https://www.accessdatafda.gov/scripts/cdrh/cfdocs/cfRES/res.cfm?ed=189015.
[2] *Id.*

to hereafter as "non- conforming") vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance. The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. **Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, or component fatigue cracking/fracture, all leading to corrective revision surgery.[3]**

53.    The "Urgent Medical Device Correction" clarified that Exactech was expanding its recall to now include all knee arthroplasty polyethylene inserts packed in non-conforming bags regardless of label or shelf life. The components subject to the recall now included: OPTETRAK®: All-polyethylene CR Tibial Components, All-polyethylene PS Tibial Components, CR Tibial Inserts, CR Slope Tibial Inserts, PS Tibial Inserts, HI-FLEX® PS Tibial Inserts; OPTETRAK Logic®: CR Tibial Inserts, CR Slope Tibial Inserts, CRC Tibial Inserts, PS Tibial Inserts, PSC Tibial Inserts, CC Tibial Inserts; TRULIANT®: CR Tibial Inserts, CR Slope Tibial Inserts, CRC Tibial Inserts, PS Tibial Inserts, PSC Tibial Inserts; and VANTAGE Fixed-Bearing Liner Components.[4]

54.    In its February 7, 2022 correspondence, Exactech advised surgeons that revision surgery should be considered for patients who exhibited symptoms consistent with premature polyethylene wear.

### Plaintiff's Failed Implant & Subsequent Revision Surgery

55.    On May 31, 2018, Plaintiff, Kelly Goodridge, underwent a TKA on her left

---

[3] *See* Exactech's "Urgent Medical Device Correction" letter, dated Feb. 7, 2022, available online at: https://www.exac.com/wp-content/uploads/2022/02/Exactech-DHCP letter. 02.07.2022.pdf.
[4] *Id.*

knee and was implanted with an Exactech TKA System at the Hospital for Special Surgery in Stamford, Connecticut.

56.    Although the plaintiff, Kelly Goodridge, initially did well following the TKA procedure, in January of 2022 she began experiencing pain and swelling in her left knee.

57.    Over the course of the ensuing several months the Plaintiff, Kelly Goodridge's condition continued to deteriorate requiring various medical evaluations and diagnostic studies.

58.    Given the foregoing deterioration, the Plaintiff's orthopedic surgeon recommended that Ms. Goodridge undergo a revision surgery of her total knee replacement.

59.    The revision surgery was performed on August 8, 2022.

60.    In the course of the foregoing revision surgery, the Plaintiff's orthopedic surgeon encountered extensive synovial expansion and hypertrophy, as well as very severe wear and delamination of the polyethylene 9mm insert designed, tested, developed, manufactured, labeled, packaged, marketed, distributed and sold by Exactech.

61.    Prior to the revision surgery, the Plaintiff Kelly Goodridge was unaware of any issues with the tibial polyethylene insert designed, tested, developed, manufactured, labeled, packaged, marketed, distributed and sold by Exactech.

62.    After the revision surgery the Plaintiff Kelly Goodridge experienced significant complications requiring various medical evaluations, diagnostic studies, treatment, therapy, and additional surgeries.

63.    The plaintiff Kelly Goodridge continues to experience stiffness, loss of

strength, chronic pain, and poor functionality of her left knee.

64.     As a direct, proximate and legal consequence of the defective nature of the Exactech TKA System, the plaintiff, Kelly Goodridge, has suffered significant and continuing personal injuries, has permanent injuries and scarring, is limited in her activities of daily living, requires additional medical care and treatment, has lost time from work, will continue to lose time from work, has suffered a loss of earning capacity, has suffered a loss of enjoyment of life's activities, has suffered physical and mental pain and suffering, and has incurred and will continue to incur substantial medical bills and expenses.

## *EQUITABLE TOLLING OF STATUTE OF LIMITATIONS*

65.     Exactech willfully, wantonly, or intentionally withheld information from Plaintiff, Plaintiff's healthcare providers, and the public concerning the known hazards associated with its TKA Systems, inclusive of the one implanted in the Plaintiff's knee.

66.     Exactech willfully, wantonly, or intentionally withheld safety-related warnings from Plaintiff, Plaintiff s healthcare providers, and the public concerning the known hazards associated with its TKA Systems.

67.     Exactech willfully, wantonly, or intentionally withheld instructions from Plaintiff, Plaintiff's healthcare providers, and the public regarding how to identify, mitigate, or treat known hazards associated with its TKA Systems.

68.     Exactech willfully, wantonly, or intentionally conspired, and acted in concert to ignore relevant safety concerns and deliberately failed to study the long-term safety and efficacy of its TKA Systems, including the polyethylene liner used in the Plaintiff's knee surgery.

69.     Exactech failed to disclose a known defect in its design, packaging, or delivery of its TKA Systems, including the polyethylene liners used in the Plaintiff's knee replacement surgery, and instead affirmatively misrepresented that its TKA and TAA systems were as safe as, or even "superior" to, other comparable TKA and TAA systems on the market.

70.     Due to the absence of any warning or other information by Exactech as to the significant health and safety risks posed by its TKA Systems, more specifically, the polyethylene liner used in the Plaintiff's knee replacement surgery, Plaintiff was unaware that his TKA contained a faulty liner, which was likely to cause a premature failure of the entire joint replacement system. Additionally, this danger was not known to Plaintiff's healthcare providers or to the general public.

71.     Given Exactech's deliberate actions designed to deceive or mislead Plaintiff, Plaintiff's healthcare providers, and the general public with respect to the safety and efficacy of Exactech's TKA systems, Defendants are estopped from relying on any statute of limitations defenses.

## *COUNT ONE – CONNECTICUT PRODUCTS LIABILITY ACT C.G.S. §52-572m, ET SEQ*

72.     Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

73.     Pursuant to the Connecticut Products Liability Act, Connecticut General Statutes §52-572m, et seq, Exactech is liable and responsible to Plaintiff for injuries and damages arising from the defective and unreasonably dangerous nature of the Exactech TKA System implanted in the Plaintiff's knee.

74.     At    all    relevant    times,    Exactech    designed,    tested,    developed,

manufactured, labeled, packaged, marketed, distributed, or sold its TKA Systems for implantation into patients, such as Plaintiff, by orthopedic surgeons in the United States.

75.    Exactech had a duty to manufacture, market, package, and distribute its TKA Systems, including their component parts, in a manner that prevented unreasonable risk of harm or injury to patients, including Plaintiff.

76.    Exactech knew (or reasonably should have known) that its TKA Systems were defective as manufactured, packaged, marketed and distributed.

77.    Exactech's TKA Systems were not reasonably safe as manufactured, packaged, marketed or distributed by Exactech.

78.    The manufacturing and packaging defects in Exactech's TKA Systems, including the one implanted in the Plaintiff, existed when the devices left Exactech's control.

79.    The Exactech TKA System implanted in the Plaintiff's knee reached Plaintiff without substantial change in its condition.

80.    The Exactech TKA System implanted in the Plaintiff's knee was defective when it entered the stream of commerce and received by Plaintiff because the foreseeable risks of the TKA System exceeded or outweighed the purported benefits associated with the TKA System.

81.    Feasible safer alternative designs and packaging that provided the same functional purposes were available to Exactech at the time the Plaintiff's TKA System was designed, packaged, and offered for sale in the market.

82.    The Exactech TKA System implanted in the Plaintiff's knee and its corresponding packaging, were not reasonably safe as labeled, distributed, marketed,

delivered, or sold by Exactech.

83.    The Exactech TKA System implanted in the Plaintiff's knee was defective and unreasonably dangerous when it entered the stream of commerce and was received by Plaintiff and Plaintiff's doctors, because the warnings in the instructions for use, operative techniques, directions, marketing and promotional materials, advertisements, white papers, and other communications provided by Exactech or its sales force to doctors and patients failed to adequately convey the potential risks, side effects and dangerous propensities of the System, which risks Exactech knew or reasonably should have known.

84.    Exactech's TKA Systems, including the component parts implanted at the time of the Plaintiff's surgery, were defective as manufactured, marketed, packaged and distributed because Exactech:

a)    failed to package the polyethylene components in vacuum bags that contained a secondary barrier layer containing ethylene vinyl alcohol (EVOH) to prevent the components from oxidizing before they were implanted;

b)    selected materials to package its TKA Systems, which were of an inferior grade or quality;

c)    failed to set appropriate manufacturing specifications to ensure that its TKA Systems performed safely, appropriately, and as intended;

d)    failed to periodically test to ensure that its TKA Systems as manufactured met Exactech's intended specifications;

e)    failed to establish internal quality control protocols and procedures to ensure that is TKA Systems as manufactured met Exactech's intended

specifications;

f)    failed to comply with internal quality control protocols and procedures to ensure that its TKA Systems as manufactured met Exactech's intended specifications;

g)    failed to take collective actions to eliminate or minimize further failures of its TKA Systems;

h)    failed to select appropriate third parties to package the polyethylene inserts used in its TKA Systems;

i)    failed to properly supervise and monitor the packaging of the polyethylene inserts used in its TKA Systems;

j)    developed its TKA Systems in a manner which resulted in a propensity to undergo substantial early polyethylene wear, component loosening, or other failure modes;

k)    failed to conduct adequate testing on component parts, subassemblies, and/or the finished TKA Systems, as package and distributed;

l)    failed to take adequate steps to identify failure modes with its TKA System, including the one implanted in the Plaintiff, with clarity to suggest methods to monitor, avoid or prevent further failures;

m)    failed to identify or note the significance of any testing that resulted in failures of its TKA Systems;

n)    failed to take corrective actions to eliminate or minimize further failures of its TKA Systems;

o)    designed the polyethylene insert and packaging in a manner that

increased risk of users and patients suffering from pain, discomfort, injury and the need for revision surgery;

p)    failed to adequately disclose the devices' propensity to undergo substantial early polyethylene wear, component loosening or other failure;

q)    failed to warn doctors and patients about the potential risks, side effects and dangerous propensities of its TKA Systems, including the one implanted in the Plaintiff's knee, which risks Exactech knew or reasonably should have known;

r)    marketed and promoted its TKA Systems, including the one implanted in Plaintiff's knee, as being of excellent quality when they knew that to be inaccurate;

s)    were negligent in the manufacturing marketing, packaging, or distribution of its TKA Systems in the manners set forth above.

85.    The Exactech TKA Systems, including their component parts, which were manufactured, marketed, packaged, and distributed by Exactech, reached patients, including the Plaintiff, without substantial change in condition.

86.    Plaintiff's doctors implanted the Exactech TKA System in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Exactech.

87.    At no time did the Plaintiff (or Plaintiff's doctors) have any reason to believe that the Plaintiff's Exactech TKA System and its packaging were in a condition not suitable for proper and intended use.

88.    Plaintiff could not, by the exercise of reasonable care, have discovered the

defects in the Exactech TKA System implanted in his knee and perceived its dangers or avoided injury.

89.    As a direct and proximate result of one or more of the foregoing wrongful acts or omissions of Exactech, Plaintiff suffered profound injuries that are permanent and continuing in nature. These injuries required medical treatment and will require on-going medical treatment, resulting in significant past and future medical expenses. Additionally, Plaintiff suffered and will continue to suffer economic losses, loss of enjoyment of life's activities, and physical and mental pain and suffering.

90.    Exactech are strictly liable for the defective manufacture, marketing, packaging and distribution of its TKA Systems and the injuries and losses sustained by Plaintiff.

### *PUNITIVE DAMAGES*

91.    Plaintiff adopts and incorporates by reference all of the foregoing language of this Complaint as if fully set forth herein and further states as follows:

92.    The injuries and damages suffered by the Plaintiff were the result of Exactech's reckless disregard for the safety of product users, including the Plaintiff, and as such the Plaintiff is entitled to an award of punitive damages pursuant to Connecticut General Statutes §52-240b.

93.    **WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with pre-judgment and post-judgment interest, costs of suit, attorneys' fees, and all such other and further relief as this Court deems just and proper.

### *PRAYER FOR RELIEF*

94.    Plaintiff respectfully requests the following damages be considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate Plaintiff:

a)    Plaintiff's past and future medical expenses, lost wages, loss of earning capacity, and other compensatory damages to be proven at trial;

b)    Damages for past, present, and future emotional distress, loss of enjoyment of life's activities, pain and suffering, mental anguish, and other non-economic losses;

c)    Past, present, and future out-of-pocket costs;

d)    Attorney's fees, expenses, and recoverable costs incurred in connection with this action;

e)    Pre- and Post-Judgment Interest;

f)    Punitive Damages; and

g)    Such other relief to which Plaintiff may be justly entitled.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby requests a trial by jury on all counts and as to all issues.

Respectfully submitted,

/s/ Edward P. Brady, III
Edward P. Brady, III – #ct07017
Coyne, von Kuhn, Brady & Fries, LLC
4 Armstrong Road
Shelton, CT 06484
Phone:  203-378-7100
Fax:  203-378-7711
ebrady@coynelaw.com